UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARYAM MUHAMMAD, | : |
| Plaintiff, | : CIVIL ACTION NO. |
| v. | : |
| CHI-ST. JOSEPH CHILDREN'S HEALTH; ST. JOHN NEUMAN SCHOOL FOR CHILDREN AND FAMILIES; PHIL GOROPOLOUS (individually); BETH GROSSMAN (individually); and SHANNON DILLER (individually), | : PLAINTIFF REQUESTS TRIAL BY JURY |
| Defendants. | : |

## COMPLAINT

Plaintiff, MARYAM MUHAMMAD, by and through undersigned counsel hereby files this Civil Action Complaint against Defendants CHI-ST. JOSEPH CHILDREN'S HEALTH; ST. JOHN NEUMANN SCHOLL FOR CHILDREN AND FAMILIES; PHIL GOROPOLOUS; (individually); BETH GROSSMAN (individually); and SHANNON DILLER (individually) (hereinafter collectively referred to as "Defendants") and avers the following:

## PARTIES

1. Plaintiff MARYAM MUHAMMAD (hereinafter also referred to as "Plaintiff") is an African American female who, at all times material, was a resident of the state of Delaware.

2. At all times material, Defendant, CHI – ST. JOSEPH'S CHILDREN HEALTH SERVICES, (hereinafter also referred to as "Defendant SJCHS"), was and still is a miscellaneous corporation organized and existing by virtue of the laws of the Commonwealth of Pennsylvania with its principal place of business located at 1929 Lincoln Highway E., Ste. 150, Lancaster, PA 17602.

1

3. Defendant PHIL GOROPOLOUS (hereinafter also referred to as "Defendant GOROPOLOUS") was and still is employed by Defendant SJCHS as the President.

4. Defendant GOROPOLOUS is a Caucasian male.

5. At all relevant times Defendant GOROPOLOUS maintained supervisory authority over Plaintiff.

6. Defendant BETH GROSSMAN (hereinafter also referred to as "Defendant GROSSMAN") was and still is employed by Defendant SJCHS as the Vice President.

7. Defendant GROSSMAN is a Caucasian female.

8. At all relevant times Defendant GROSSMAN maintained supervisory authority over Plaintiff.

9. Defendant SHANNON DILLER (hereinafter also referred to as "Defendant DILLER") was and still is employed by Defendant SJCHS as the Behavioral of Health Therapist.

10. Defendant DILLER is a Caucasian male.

11. At all times material, Defendant DILLER held supervisory authority over Plaintiff.

12. At all times material, Defendant were the joint employers of Plaintiff.

## NATURE OF THE CASE

13. This is an action for damages and other relief pursuant to Section 1981; Title VII of the Civil Rights Act of 1964 ("Title VII"), as codified, 42 U.S.C. §§ 2000e to 20003-17 (amended in 1972, 1978, by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"); and the Pennsylvania Human Relations Act, as amended, 43 P.S. §§ 951, *et. seq.* ("PHRA"); and seeks damages to redress the injuries PLAINTIFF has suffered as a result of being subjected to discrimination and wrongful termination by the aforementioned Defendants.

14. Furthermore, this action is to redress the Defendants' unlawful employment practices against PLAINTIFF, including Defendants' unlawful discrimination against PLAINTIFF because of

her race/color, religion, hostile work environment, and for Defendants wrongful actions against PLAINTIFF for leading to her unlawful termination.

15. PLAINTIFF seeks declaratory and injunctive relief, actual damages, compensatory damages, punitive damages, reinstatement, attorneys' fees, litigation costs, and pre- and post-judgment interest as remedies for Defendants' violations of her rights.

## JURISDICTION AND VENUE

16. This action involves a Question of Federal Law under 28 U.S.C. § 1331, Section 1981 and Title VII of the Civil Rights Act of 1964. This honorable Court also has supplemental jurisdiction over the Commonwealth Law Causes of Action.

17. Venue is proper in the Eastern District of Pennsylvania as PLAINTIFF was employed by Defendants and worked in Lancaster County, Pennsylvania where the discrimination, harassment and hostile work environment complained of occurred.

18. On or around February 4, 2022, PLAINTIFF filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendants as set forth herein. PLAINTIFF'S Charge of Discrimination (530-2022-02498) was dual filed with the Pennsylvania Human Relations Commission ("PHRC").

19. On or about August 8, 2022, the EEOC sent a Dismissal and Notice of Rights (530-2022-02498) to PLAINTIFF by electronic mail.

20. This action is hereby commenced within the deadline set forth in the Determination and Notice of Rights issued by the EEOC on August 8, 2022.

## MATERIAL FACTS

21. On or around April 2021, Plaintiff applied for a position of Director of Behavioral Health Operations with Defendant SJCHS.

22. On or around May 14, 2021, Plaintiff had her first interview with Defendants GOROPOLOUS and GROSSMAN.

23. During the interview, Defendant GOROPOLOUS referenced Plaintiff's race and ethnicity. Specifically, Defendant GOROPOLOUS made remarks such as, "We just interviewed a very intelligent black psychiatrist woman who declined our offer because she didn't feel comfortable following her interview" and "I believe she was uncomfortable being a minority and saw the Trump signs."

24. Defendant GOROPOLOUS then asked Plaintiff, "How would you feel being the only black woman on leadership" and "How did you feel passing all the Trump signs on your way here?"

25. These comments made Plaintiff feel extremely uncomfortable.

26. On or around May 20, 2021, Plaintiff had her second interview with Defendant GOROPOLOUS and Defendant GROSSMAN, Director of Family Services, Jill Saikia, and Therapy Manager, Alicia Janitz.

27. During Plaintiff's second interview, Defendant GOROPOLOUS made more racially-charged remarks including, "We don't have any black therapists working here – we can't find any qualified ones."

28. Defendant GOROPOLOUS then directed a micro-aggression at Plaintiff stating, "You're very articulate and bright and we can't believe you're working on your doctorate."

29. Plaintiff was hired for the position of Director of Behavioral Health Operations on July 6, 2021.

30. On July 14, 2021, during Plaintiff's new hire orientation, unsolicited, Defendant GOROPOLOUS told Plaintiff that "black people earn less than white people."

31. Defendant GOROPOLOUS then referenced a quantitative study that outlined the pay difference between African Americans and Caucasians. Defendant GOROPOLOUS frequently referenced this study in front of Plaintiff.

32. When Plaintiff started at Defendant SJCHS, she enrolled her son in St. John Neumann School for Children and Families ("SJNS"), a form of childcare provided as an option to Defendant SJCHS employees.

33. When Plaintiff enrolled her son in SJNS, she informed Michelle Kiem, Food Service and Nutrition Manager, that she and her son are of the Islamic religion and have specific, religious, dietary restrictions and instructed SJNS that they must abide by these restrictions.

34. In blatant disregard of Plaintiff's instructions, SJNS provided Plaintiff's son with food that was not within his religion's dietary restrictions.

35. As a result of SJNS's outward disrespect for Plaintiff's religious beliefs and dietary restrictions, Plaintiff's son became extremely sick.

36. When Plaintiff picked her son up from SJNS, Amanda Schein, Assistant Teacher, informed Plaintiff that Ms. Keim fed Plaintiff son non-halal meat, which is a severe violation of Plaintiff's religion and religious dietary restrictions.

37. Jessica Bailey, Family Engagement Manager, informed Plaintiff that she had to contact Lori McCracken, Vice President of Education, regarding the food incident, as Ms. Bailey could not address the incident due to her "mutual accountability."

38. Due to this egregious offense, Plaintiff removed her son from SJNS.

39. Although feeding Plaintiff's son non-halal meat (and other food) was a grave offense and in direct contravention of Plaintiff's religious beliefs, Ms. McCracken emailed Plaintiff indicating that "we dropped the ball and I'm sorry" in reference to SJNS providing Plaintiff's son beef.

40. Despite the serious insubordination of Defendants, Ms. McCracken showed no remorse regarding the food incident.

41. Upon information and belief, Ms. McCracken commented to Defendant GOROPOLOUS, "why do we care about this situation if she's withdrawing her son from [SJNS]?"

42. Defendant GOROPOLOUS ordered Plaintiff to "not say anything" regarding Ms. McCracken's comment. When Plaintiff asked Defendant GOROPOLOUS what his response was to the food incident, he told her that "we still dropped the ball" and that Plaintiff should not have faith in [Defendant SJCHS] leadership."

43. Defendant GOROPOLOUS presented no concern and never investigated the incident.

44. On July 19, 2021, Plaintiff had a meeting with Compliance Manager, Rose Flosser. Ms. Flosser informed Plaintiff that Defendant GOROPOLOUS was gossiping about Plaintiff. Specifically Defendant GOROPOLOUS told other employees of the "food incident" with Plaintiff's son.

45. Additionally, Ms. Flosser made comments about Plaintiff being single mother, perpetuating the offensive racial stereotype of an African American single mother.

46. However, Plaintiff's husband had recently passed away, making Ms. Flosser's comment extremely distasteful.

47. Ms. Flosser also told Plaintiff that she should not trust the executive leadership at Defendant SJCHS because they didn't like her and that Defendant GOROPOLOUS didn't like "strong personalities."

48. Ms. Flosser informed Plaintiff that Defendant GOROPOLOUS constantly commented that he "couldn't believe we hired a black woman."

49. Following the meeting with Ms. Flosser, Plaintiff contacted Defendant GROSSMAN, who told Plaintiff that she would speak with Defendant GOROPOLOUS.

50. The following day, Defendant GOROPOLOUS came to Plaintiff's office and suggested they take a walk.

51. During the walk, Defendant GOROPOLOUS reported that he wanted to fire Ms. Flosser for telling Plaintiff about his comments about Plaintiff.

52. A few weeks later, Plaintiff had her first supervision meeting with Defendant GOROPOLOUS. During this meeting, Defendant GOROPOLOUS asked Plaintiff where she was from. When Plaintiff responded, "Philadelphia," Defendant GOROPOLOUS asked, "No, what are you? Where is your family from? I asked because your hair is curly but we all know not all dark skinned people are just black."

53. Plaintiff immediately informed Respondent GOROPOLOUS that his question was a micro insult, to which Defendant GOROPOLOUS responded, "I'm not racist. My wife is Mexican and I report to a black CEO."

54. Defendant GOROPOLOUS then told Plaintiff that her strongness was "making the psychiatrists uncomfortable" and suggested Plaintiff should "tone it down and stroke [the psychiatrist's] ego because you know how they work."

55. Defendant GOROPOLOUS also remarked that "this is a fucking unique culture and you're a strong black woman, something we're not used to."

56. On one occasion, Plaintiff asked Defendant GOROPOLOUS if she could work from home, as her son wasn't feeling well. Defendant GOROPOLOUS responded, "I hope he feels better," but would not permit Plaintiff to work from home. However, Defendant GOROPOLOUS permitted one of Plaintiff's Caucasian counterparts, Ms. Janitz, to work from home when her son was exposed to COVID-19 via Defendant SJCHS' daycare.

57. On August 16, 2021, Defendant DILLER requested a meeting with Plaintiff.

58. At the meeting Defendant DILLER informed Plaintiff that Respondent Defendant was intimidated by Plaintiff.

59. Additionally, Defendant DILLER told Plaintiff that Defendant GROSSMAN and GOROPOLOUS intended to hire Defendant DILLER as Manager of Therapy, but then hired Alicia Jantz.

60. When Plaintiff inquired why Defendant DILLER was not hired for the position and recommended he speak with his direct manager, Defendant DILLER laughed at Plaintiff.

61. Defendant DILLER also told Plaintiff that the work culture isn't used to "a strong black woman" and "people become uncomfortable if you spot operational problems."

62. After her meeting with Defendant DILLER, Plaintiff met with Defendant GROSSMAN. During this meeting, Defendant GROSSMAN spoke to Plaintiff in a condescending manner. Defendant GROSSMAN told Plaintiff to "tone down her smartness" because it may frustrate Plaintiff's teammates.

63. When Plaintiff asked Defendant GROSSMAN to expand on the above statement, Defendant GROSSMAN responded that "you can make people uncomfortable."

64. On September 1, 2021, Plaintiff had another supervision meeting with Defendant GOROPOLOUS.

65. At this meeting, Defendant GOROPOLOUS told Plaintiff that she needed to "mesh with the mutual accountable leadership team" and that she needed to be mindful of her approach. When she asked Defendant GOROPOLOUS what he meant, he responded that "[Plaintiff] is articulate but it can come off as if [Plaintiff] is better than people."

66. On September 8, 2021, a team meeting took place. During this meeting Defendant GOROPOLOUS repeatedly spoke over Plaintiff, but permitted Caucasian employees opportunities to speak. When Plaintiff attempted to speak, Defendant GOROPOLOUS would cut her off.

67. At one point during the meeting, when Plaintiff was speaking, Defendant GOROPOLOUS interrupted Plaintiff, stated he had to go to a meeting in Colombia, and abruptly left.

68. On September 13, 2021, Defendant DILLER requested a meeting with Plaintiff.

69. During this meeting, Defendant DILLER told Plaintiff that she was a "strong black woman and "a beautiful woman inside and out" and wore "hot red pants."

70. Defendant DILLER then delivered a micro- aggression and said that he couldn't believe how smart Plaintiff is and that he wished they had met under different circumstances.

71. Defendant DILLER continued to make Plaintiff uncomfortable with his comments by referencing the "happy ending" he received while overseas in Asia and "difficulty achieving an orgasm."

72. When Plaintiff told Defendant DILLER that his comments were inappropriate and made her uncomfortable, Defendant DILLER did not stop. Instead, Defendant DILLER told Plaintiff that she was "a beautiful woman inside and out."

73. Plaintiff again told Defendant DILLER that he was making her uncomfortable and told him not to reference her race or appearance.

74. After the meeting, Plaintiff reported Defendant DILLER's behavior to Defendant GOROPOLOUS, who told Plaintiff that Defendant DILLER probably didn't mean anything by the comments and dismissed Plaintiff's concerns.

75. Later that same day, Plaintiff was speaking with her teammates when she made a joke in passing regarding her plans for the upcoming weekend.

76. The next day, on September 14, 2021, Jadeia Howell, coworker, texted Plaintiff and told her that Defendant DILLER had overheard her joke from the previous day and that Defendant GOROPOLOUS and GROSSMAN wanted to meet with Plaintiff.

77. Defendant GOROPOLOUS then messaged Plaintiff and told her to come to the board room for a meeting.

78. Defendant GOROPOLOUS and GROSSMAN were present at the meeting.

79. During the meeting Defendant GOROPOLOUS terminated Plaintiff stating that he didn't like leaders who made jokes because it's unprofessional.

80. When Plaintiff attempted to explain, Defendant told Plaintiff that they didn't want her working for Defendant and repeated that Plaintiff was terminated.

81. Plaintiff was never provided any paperwork.

82. During her employment, Plaintiff had never been written up or disciplined.

83. Defendant's reasoning for firing Plaintiff is pretextual.

84. Upon information and belief, Defendant hired Kenda Hohenwarter (Caucasian) to replace Plaintiff.

85. Respondents fired Plaintiff due to her race, sex, and religion. Additionally, Defendant fired Plaintiff in retaliation for her complaints regarding Defendant DILLER.

86. As a result of Defendants' conduct, PLAINTIFF was caused to sustain serious and permanent personal injuries, including permanent psychological injuries.

87. As a result of Defendants' actions, PLAINTIFF felt extremely humiliated, degraded, victimized, embarrassed emotionally and physically distressed.

88. As a result of the acts and conduct complained of herein, PLAINTIFF has suffered and will continue to suffer a loss of income, loss of salary, bonuses, benefits and other compensation to which such employment entailed.

89. PLAINTIFF also suffers future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

90. PLAINTIFF has further experienced severe emotional and physical distress.

91. At all material times, Defendants refused to investigate and take appropriate remedial action in response to PLAINTIFF'S ongoing and continued reports and complaints of discrimination, harassment and hostile work environment.

92. At all material times, Defendants refused to initiate any corrective action.

93. Defendants discriminatory conduct was severe and pervasive, and created a hostile work environment for PLAINTIFF.

94. The above are just some examples of some of the discrimination and retaliation to which Defendants subjected PLAINTIFF.

95. PLAINTIFF claims a pattern and practice of discrimination, claims continuing violations, and makes all claims herein under the continuing violations doctrine.

96. Defendants have exhibited a pattern and practice of not only discrimination but also retaliation.

**COUNT I
UNDER FEDERAL LAW
<u>S.C. SECTION 1981</u>
(against all named Defendants)**

1.   PLAINTIFF hereby incorporates all allegations contained in the above paragraphs as fully as if they were set forth at length.

2.   42 USC Section 1981 states in relevant part as follows:

> (a) Statement of equal rights All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. (b) "Make and enforce contracts" defined for purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C.A. § 1981.

3. PLAINTIFF was discriminated against by Defendants because of her race as provided under 42 USC Section 1981 and has suffered damages as set forth herein.

4. PLAINTIFF claims unlawful retaliation under 42 U.S.C. 1981 due to Defendant's termination her employment due to her race and/or national origin and/or religion.

5. PLAINTIFF also claims unlawful retaliation under 42 U.S.C. 1981 for her opposition to Defendants' unlawful employment practices.

## COUNT II
## DISCRIMINATION UNDER TITLE VII
## HOSTILE WORK ENVIRONMENT AND DISPARATE TREATMENT
### (against corporate Defendants only)

6. PLAINTIFF hereby incorporates all allegations contained in the above paragraphs as fully as if they were set forth at length.

7. SEC. 2000e-2. *[Section 703]* states as follows:

> (a) Employer practices
> It shall be an unlawful employment practice for an employer –
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment inany way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

8. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against PLAINTIFF because of her race and/or national origin and/or religion.

9. The discrimination and harassment described above and incorporated into Count IV was severe and pervasive and created a hostile work environment for PLAINTIFF.

10. Defendants subjected PLAINTIFF to discrimination and harassment due to PLAINTIFF'S race and/or national origin and/or religion.

11. Defendants subjected PLAINTIFF to discrimination and harassment by unlawfully terminating her employment due to her race and/or national origin and/or religion.

12. PLAINTIFF hereby makes a claim against Defendants under all of the applicable paragraphs of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended.

### COUNT III
### RETALIATION UNDER TITLE VII
### (against corporate Defendants only)

13. PLAINTIFF hereby incorporates all allegations contained in the above paragraphs as fully as if they were set forth at length.

14. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be an unlawful employment practice for an employer: "(1) to…discriminate against any of his employees…because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing under this subchapter."

15. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e *et seq.* by retaliating against PLAINTIFF with respect to the terms, conditions, and/or privileges of her employment because of her opposition to and reporting of the unlawful employment practices of Defendants.

### COUNT VI
### PHRA DISCRIMINATION
### PHRA § 955
### (against all Defendants)

16. PLAINTIFF hereby incorporates all allegations contained in the above paragraphs as fully as if they were set forth at length.

17. PHRA § 955(d) provides that it shall be an unlawful discriminatory practice: "For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act."

18. Defendants engaged in unlawful employment practices prohibited by the PHRA by intentionally discriminating against PLAINTIFF with respect to her compensation, terms, conditions of employment because of PLAINTIFF'S race, national origin, and religion. Defendants subjected PLAINTIFF to adverse tangible employment actions—defined as significant changes in PLAINTIFF'S employment status, discipline, denial of training, failure to promote, reassignment with significantly different job responsibilities, and decisions causing changes in significant changes in her employment benefits.

19. PLAINTIFF'S protected characteristics played a determinative factor in Defendants' decisions.

20. Defendants cannot show any legitimate nondiscriminatory reasons for their employment practices and any reasons proffered by Defendants for their actions against PLAINTIFF are pretextual and can readily be disbelieved.

21. Alternatively, PLAINTIFF'S protected status played a motivating part in Defendants' decisions even if other factors may also have motivated their actions against PLAINTIFF.

22. Defendants acted with the intent to discriminate.

23. Defendants acted upon a continuing course of conduct.

24. Defendants acted with the intent to discriminate against PLAINTIFF because of her race, national origin, and religion.

25.    Defendants wrongfully terminated PLAINTIFF, in violation of the PHRA, solely or in part because of her race, national origin, and religion.

26.    PLAINTIFF hereby makes a claim against Defendants under all applicable paragraphs of the PHRA § 955.

## COUNT VII
### RETALIATION UNDER STATE LAW - RETALIATION
**(against all Defendants)**

27.    PLAINTIFF hereby incorporates all allegations contained in the above paragraphs as fully as if they were set forth at length.

28.    PHRA § 955(d) provides that it shall be an unlawful discriminatory practice: "For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act."

29.    Defendants engaged in an unlawful discriminatory practice by discharging, retaliating, and otherwise discriminating against the PLAINTIFF because of PLAINTIFF'S opposition to the unlawful employment practices of PLAINTIFF'S employer.

30.    PLAINTIFF reported and opposed the discrimination and harassment and the abusive and hostile work environment was ratcheted up.  PLAINTIFF was subjected to discipline and was ultimately terminated from her employment.

## COUNT VIII
### DISCRIMINATION UNDER STATE LAW – AIDING AND ABETTING…
**(against individually named Defendants only)**

31.    PLAINTIFF hereby incorporates all allegations contained in the above paragraphs as fully as if they were set forth at length.

32. PHRA § 955(e) provides that it shall be an unlawful discriminatory practice: " For any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice."

33. Defendants engaged in an unlawful discriminatory practice in violation of PHRA §955(e) by committing assault and battery, aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

34. The individually named Defendants took active part by aiding, abetting, compelling, and inciting the discrimination and harassment described in detail above.

35. Any individuals who may not have had direct supervisory authority over PLAINTIFF are still subject to individual liability under this section as they actively took unlawful action against PLAINTIFF pursuant to the direction, instruction, and sanctioning of individuals with direct supervisory authority over PLAINTIFF.

36. Individuals without supervisory authority act with supervisory authority when they carry out unlawful discriminatory conduct at the direction and with the express authorization of individuals with supervisory authority.

## JURY DEMAND

PLAINTIFF requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, PLAINTIFF demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, punitive damages,

liquidated damages, statutory damaged, attorney's fees, costs, and disbursement of action; and for such other relief as the Court deems just and proper.

**DEREK SMITH LAW GROUP, PLLC**

By: ___/s/Erica A. Shikunov___
      Erica A. Shikunov, Esquire
      1835 Market Street, Suite 2950
      Philadelphia, Pennsylvania 19103
      Phone: 215.391.4790
      Email: erica@dereksmithlaw.com

DATED: November 1, 2022