**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MARYAM MUHAMMAD,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **CHI-ST. JOSEPH CHILDREN'S** | **NO.  22-4363** |
| **HEALTH and** | |
| **PHILIP GOROPOLOUS,** | |
| **Defendants.** | |

**HODGE, J.**                                                                                    **August 8, 2025**

## MEMORANDUM

Before the Court is a case arising from Plaintiff Maryam Muhammad's termination by her employer, Chi-St. Joseph's Children's Health ("CHISJCH"), and the treatment she received from her supervisor Philip Goropolous. Plaintiff has filed claims against the Defendants for discrimination, harassment, and retaliation under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 1981 ("§1981") and the Pennsylvania Human Relations Act ("PHRA").

Muhammad, a Black woman, maintains that she was repeatedly and regularly subjected to racist comments and actions by Goropolous and other employees during her employment at CHISJCH. Defendants assert that she was terminated for repeatedly telling others that she planned to quit her job, which Defendants contend led to her having a poor relationship with her colleagues. Defendants seek summary judgment on all of Plaintiff's discrimination, retaliation, and hostile work environment claims. For the following reasons, Defendants' motion is granted in part and denied in part.

## I.    FACTUAL BACKGROUND[1]

Plaintiff Maryam Muhammad is an African American woman. (ECF No. 27 ¶ 1.)[2] In May 2021, Plaintiff was hired as Director of Behavioral Health Operations at CHISJCH, with a start date of July 6, 2021. (*Id.*) The Director of Behavioral Health Operations was created to supervise the "back office" functions at CHISJCH, including insurance reimbursement, prescription paperwork, other administrative work, and scheduling. (*Id.* ¶ 2.) During her entire employment, Plaintiff supervised four employees: Rose Flosser, Eva Torres, Ciara Lopez, and Ja'deia Howell. (*Id.* ¶ 3.)

Defendant Philip Goropoulos was the President of CHISJCH and was Plaintiff's immediate supervisor. (*Id.* ¶ 4.) Elizabeth Grossman was the Vice President of Operations. Defendant characterizes Grossman as Plaintiff's "dotted line" supervisor; however, Plaintiff disputes this characterization. (ECF No. 27 ¶ 6; ECF No. 29-3 ¶ 6.) Other relevant CHISJCH employees include Shannon Diller, a therapist, Thomas Foley, the lead psychiatrist, Alicia Jantzi, Director of Therapy Services, and Jillian Black, Director of Family Wellness. (ECF No. 27 ¶¶ 5, 7-9; ECF No. 27-1, 205:1-20.) Plaintiff, Jantzi, Foley, and Black, all managers, were at equal levels in the organization hierarchy, and were expected to work together. (*Id.* ¶ 10.)

Defendant contends that Goropolous and Grossman "observed that Plaintiff had difficulty building trust and rapport with her team and her peers, which limited her effectiveness" in CHISJCH's management structure. (*Id.* ¶ 12.) Plaintiff disputes this, and states that she sought to

---

[1]    The facts recited by the Court in this opinion reflect Defendants' Statement of Undisputed Facts (ECF No. 27.) Where Plaintiff has disputed those facts, that is noted. In addition, Defendants state that they will not address Plaintiff's own Statement of Undisputed Facts, because the Local Rules and Policies and Procedures do not provide for this. (ECF No. 31 at 1, n. 1.) Defendants are mistaken. This Court's Policies and Procedures state that "The responding party also shall set forth, in separate numbered paragraphs, any additional facts which the respondent contends preclude summary judgment." *See* Judicial Policies and Procedures, Judge Kelley B. Hodge, Section E, available at https://www.paed.uscourts.gov/judges-info/district-court-judges/kelley-brisbon-hodge. Therefore, the Court will consider Plaintiff's Statement of Undisputed Facts (ECF No. 29-4) and will take them as undisputed.

[2]    The Court adopts the pagination supplied by the CM/ECF docketing system.

have one on one meetings with Jantzi and Black so that the three could have a "formal, organic, introductory process," and that Plaintiff held department meetings so that the three of them could collaborate. (ECF No. 29-3 ¶ 12.) Plaintiff further states that she did meet with Jantzi one on one. (*Id.*)

Plaintiff identifies numerous remarks and actions taken by Goropolous, Foley, Grossman, and Diller that Plaintiff characterized as "microaggressions" and "micro insults." (ECF No. 27 ¶ 14; ECF No. 29-3 ¶ 14.) These remarks and actions included the following:

**Goropolous**:

1.  Told Plaintiff "you're the only Black director who we interviewed who submitted an application here for this role." (ECF No. 27 ¶ 14(b) (citing Pl's Dep. 146:7-12))

2.  In response to Plaintiff's question about diversity efforts, said CHISJCH "can't find qualified therapists. We can't find black therapists." (ECF No. 27 ¶ 14(c) (citing Pl's Dep. 146:24- 147:4).)

3.  Told Plaintiff, "No one will come out here. Look where we're located." (*Id.* (citing Pl's Dep. 147:1-2).)

4.  Said to Plaintiff "I know you saw the Trump signs, how did that make you feel as a black woman?" (Id. at 147:3-5). (*Id.* (citing Pl's Dep. 147:2-4).)

5.  Remarked that he probably should not hire anyone Black, he should hire white or Spanish individuals because the population CHISJCH serves either speaks Spanish or are biracial. (ECF No. 27 ¶ 14(d) (citing Pl's Dep. 149:10-21).)

6.  Made comments about Plaintiff's complexion and hair texture. (ECF No. 27 ¶ 14(e) (citing Pl's Dep. 147:8-10).)

7. Said to Plaintiff that as a "strong black woman you have to tone it down; you have to learn how to rub arms and shoulders with your white counterparts so they can feel comfortable." (ECF No. 27 ¶ 14(f) (citing Pl's Dep. 147:13-16).)

8. Randomly discussed studies and surveys about how black women should be grateful that they are not earning that much less or earning less than their white counterparts. (ECF No. 27 ¶ 14(g) (citing Pl's Dep. 147:17-25).)

9. Told Plaintiff she was very articulate, and that he had never met a Black woman pursuing education at the level and rate Plaintiff was. (ECF No. 27 ¶ 14(h) (citing Pl's Dep.150:5-12).)

10. Told Plaintiff that the work culture had to get used to a strong, Black woman like Plaintiff and that "perhaps, we should tone something down." (ECF No. 27 ¶ 14(i) (citing Pl's Dep. 150:14-19).)

11. When Plaintiff attempted to present information at meetings, Goropoulos would cut Plaintiff off and interrupt her, but would not interrupt her similarly situated counterparts. (ECF No. 27 ¶ 14(j) (citing Pl's Dep. 152:10-16).)

12. On at least one occasion, Plaintiff was required to come into the office when she and her son were sick; a white employee was allowed to stay home when sick. (ECF No. 27 ¶ 14(k) (citing Pl's Dep. 152:17-153:7).)

13. Said about St. John Neumann (a school associated with CHISJCH): "I don't want us to hire too many black people here because I don't want anyone to think that this is a 'hood school', even though it's an underserved community." (ECF No. 27 ¶ 14(l) (citing Pl's Dep. 155:11-157:16).)

14. Plaintiff's white counterparts were not expected to travel in a storm, but Plaintiff was expected to come into the office during a snowstorm and stay during the storm. (ECF No. 27 ¶ 21 (citing Pl's Dep. 163:20-164:1).)

15. Despite informing Goropoulos of her dismay with her "office," Plaintiff observed Goropoulos give Plaintiff's white counterpart a full suite. (ECF No. 27 ¶ 24 (citing Pl's Dep.165:14-21).)

16. Plaintiff was not afforded a place to express breast milk, but Plaintiff's white counterpart was provided curtains for her office so she could pump comfortably. (ECF No. 27 (citing Pl's Dep.165:23-166:13).)

17. Told Plaintiff "that facial expressions on a black woman compared to a white woman can be a little more intimidating to people and especially so if [Plaintiff is] just wearing a mask because [her] eyes are big and that can be scary. So, when [Plaintiff] meet[s] with the psychiatrist, [she] should drop [her] mask, meet with him outside and smile so [she] do[es]n't come off as angry or aggressive.". (ECF No. 27 ¶ 14(m) (citing Pl's Dep. 166:22-24).)

18. Told Plaintiff that neither his neighborhood nor Dr. Foley's neighborhood would accept Black people living there. (ECF No. 27 ¶ 14(n) (citing Pl's Dep. 168:2-6).)

19. Told Plaintiff that her research questions were "coming from a black tone and I want to really target a larger audience." (ECF No. 27 ¶ 14(p) (citing Pl's Dep. 174:6-17, 175:13-15, 176:20).)

20. On one occasion, Goropoulos told Plaintiff that her hair was more appropriate pulled back in a bun than when she wore it in an Afro. (ECF No. 27 (citing Pl's Dep. 178:3-7).)

21. Asked Plaintiff if she would wear her hair in a ponytail or "platt" it down as opposed to wearing it in an Afro. (ECF No. 27 ¶ 14(u) (citing Pl's Dep. 151:6).)

**Diller:**

1. Told Plaintiff that she was a "strong, black woman." (ECF No. 27 ¶ 14(u) (citing Pl's Dep. 151:6).)

2. Told Plaintiff a story about how his brother got into a fight with a black man and that his family didn't like black people. (ECF No. 27 ¶ 14(u) (citing Pl's Dep. 151:18-22).)

3. Told her he had received a "happy ending" massage while in Thailand. (ECF No. 27 ¶ 35(citing Pl's Dep. 263:7-12).)

4. Told Plaintiff he thought her ideas were great, she "dresses nice," and that she reminded him of Asian women because she is petite. (ECF No. 27 ¶ 36 (citing Pl's Dep. 263:7-264:9).)

5. When Diller made these comments, Plaintiff asked him to leave her office. (ECF No. 27 ¶ 37 (citing Pl's Dep. 264:14, 259:24-270:8).) She then reported the conversation to Goropolous, who told Plaintiff he would "take care of it." (*Id.* ¶¶ 38-40 (citing Pl's Dep. 271:8-273:6, 275:15-17).)

**Rosa:**

1. Told Plaintiff that she was surprised Goropoulos hired her because Goropoulos doesn't hire black people and he doesn't hire anyone with a strong personality. (ECF No. 27at 154:17-21).

**Foley:**

1. Would not acknowledge Plaintiff, but when Plaintiff's white counterparts said good morning, he would engage in conversation with them. (ECF No. 27 ¶ 14(r) (citing Pl's Dep. 217:17-21).)

2. Would reject Plaintiff's ideas, but would embrace white counterparts' ideas. (ECF No. 27 ¶ 14(s) (citing Pl's Dep. 217:22-218:7).)

3. Upon hearing Plaintiff inquire about his neighborhood, Dr. Foley told Plaintiff that it's not a diverse neighborhood and that they don't like that type of people. (ECF No. 27 ¶ 14(t) (citing Pl's Dep. 218:18-23).)

**Grossman:**

1. Told Plaintiff that she needed to "tone down her smartness" (ECF No. 27 ¶ 14(v) (citing Grossman Dep. 223:23-24.)

2. Told Plaintiff that she was coming off as too much of a strong black woman and needed to turn that down. (ECF No. 27 ¶ 14(v) (citing Pl's Dep. 223:23-224:2.)

3. Made a comment after she apparently learned that Plaintiff had previously been "arrested for self- defense," remarking, "Don't tell anyone that because they are automatically going to think you are going to punch them." (ECF No. 27 ¶ 14(w) (citing Pl's Dep. 177:10-14).)

Plaintiff attempted to address her colleagues' behavior towards her directly, but was met with little support. When Plaintiff confronted Goropolous about these reported microaggressions, he responded that he wasn't racist, and was not discriminating against Plaintiff. (ECF No. 27 ¶ 17; Pl's Dep. 153:8-18 (Ex. 1).) Goropolous added that his wife is Mexican, and he reports to a Black man, therefore Plaintiff was just misunderstanding him. (*Id.*) Plaintiff also complained to Grossman about how she was being treated. (ECF No. 27-1, 181:21-25.) Plaintiff told Grossman

that Goropolous had denied her idea regarding the model CHISJCH was using, but approved an idea from Alicia, a white colleague, without Plaintiff's input. (*Id.* 182:1-12.) When Plaintiff told Grossman she believed her treatment was based on her race, Grossman replied "Absolutely not." (*Id.*, 182:12-17.) Plaintiff also reported Diller's comments to Goropolous, and Goropolous responded that "Shannon can be Shannon." (ECF No. 27 ¶ 19.)

Goropolous testified that during her first week working at CHISJCH, Plaintiff told him she was reconsidering the job and was going to leave her position. (ECF No. 27 ¶ 27.) Goropolous took Plaintiff's comments seriously and was concerned about Plaintiff's commitment to her job. (*Id.*¶ 28.) Plaintiff apparently then told Goropolous she was joking about leaving, which Goropolous told her was not funny or appropriate (*Id.* ¶¶ 29-30.) Defendants allege that the same thing took place when Plaintiff "joked" to Grossman that she was going to quit, and Grossman responded that she shouldn't joke about that. (*Id.* ¶¶ 31-32.)

On September 13, 2021, Plaintiff again made a comment about quitting, this time to her subordinates, Torres, Flosser, and Howell. (ECF No. 27 ¶¶ 41-43.) Plaintiff apparently immediately told Torres, Flosser, and Howell that she was joking about quitting. (*Id.* ¶ 44.) Torres then texted Jami Dumler, a therapist at CHISJCH, that Plaintiff had joked about quitting; Dumler told this to Diller. (*Id.* ¶¶ 46-47.) Diller then told Foley that Plaintiff planned to quit; Foley told Goropolous and Grossman. (*Id.* ¶¶ 48-49.) This led Grossman and Goropolous to "investigat[e] Plaintiff's September 13, 2021 conduct." (*Id.* ¶ 51.)

As part of the investigation, Grossman and Goropolous met with Diller on September 14, 2021. (ECF No. 27 ¶ 52.) Diller relayed to them the story about Plaintiff telling her employees that she was quitting, and how Plaintiff had said she was joking. (*Id.* ¶¶ 53-54.) Plaintiff disputes Diller's testimony. (ECF No. 29-3 ¶¶ 53-54.) Diller also said that he met with Plaintiff on

September 13, 2021, and Plaintiff told him she would be resigning at the end of the week. (*Id.* ¶ 55.) However, at the end of their conversation, Plaintiff apparently told Diller that she was joking about resigning. (*Id.* ¶ 59.) Again, Plaintiff disputes this, and says that she never had a conversation with Diller in which she indicated she planned to resign. (ECF No. 29-3 ¶ 55.) Grossman and Goropolous also spoke with Howell about Plaintiff's remarks about quitting. (ECF No. 27 ¶ 63.) According to Defendants, Howell described the events of September 13 to Grossman and Goropolous, saying that Plaintiff told Howell, Torres, and Flosser that September 13 was her last day at CHISJCH. (*Id.*) Plaintiff disputes this, stating that she told them she might not return to work, based on how she was being treated. (ECF No. 29-3 ¶ 63.) Defendants also state that Howell told Goropolous and Grossman that she [Howell], Torres and Lopez were distressed by Plaintiff's jokes about quitting. (ECF No. 27 ¶ 65.) Plaintiff disputes that they were distressed, and points to Goropolous' testimony that he did not speak with them directly. (ECF No. 29-X ¶ 65.) Howell told Grossman and Goropolous that she felt "Plaintiff's actions were 'just the worst joke ever'" and that she [Howell], Torres, and Lopez were distressed by Plaintiff's jokes. (*Id.* ¶¶ 65-66.)

During Plaintiff's period of employment, CHISJCH followed a corrective action policy. Under the policy, prior to an employment being separated, the employee was to be given coaching, issues a verbal warning, then written warning, and then a final written warning. (ECF No. 29-4 ¶¶ 23-24.) It was Goropolous' decision whether or not to implement the progressive disciplinary, also referred to as the corrective action, policy. (*Id.* ¶ 25.) During Plaintiff's employment, she was never disciplined, placed on a performance improvement plan, nor issued any verbal or written warnings. (ECF No. 29, Plaintiff's SUF ¶¶ 4-5, 26-28 (citing Grossman Dep. 56:14-16, 56: 17-19; 57:9-11, 68:10-13, 71:13-21).) According to Plaintiff, Jill Saikia (Director of Family Services) and Jantzi complemented her on her performance as Director of Behavioral Health Operations. (*Id.* ¶ 6.)

Defendants state that "based on Plaintiff's September 13, 2021 actions and her pattern of behavior that undermined her ability to effectively lead her team and . . . build [] trust," Goropolous and Grossman decided to terminate Plaintiff, effective September 14, 2021. (*Id* ¶ 69.) Prior to terminating Plaintiff, Grossman spoke only with Foley, Diller, and Howell. (ECF No. 29-4 ¶ 14.) Goropolous did not speak with Plaintiff's direct reports Lopez or Torres before terminating Plaintiff. (*Id.* ¶¶ 12-13.)

After Plaintiff was terminated, CHISJCH renamed her position to "Manager of Behavioral Health Operations." (*Id.* ¶ 29.) After Plaintiff was terminated, two white women, Saikia and Jantzi, performed what had been Plaintiff's role. (*Id.* ¶ 31.) Around January 2022, a white woman, Kendra Hohenwarter, was hired for this role. (*Id.* ¶ 30.)

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome of the suit, given the applicable substantive law, and a dispute is genuine if the evidence presented is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50 (internal citations omitted). This requirement

upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Walden v. Saint Global Corp*., 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co*., 534 F.2d 566, 573 (3d Cir. 1976)). Therefore, if after making all reasonable inferences in favor of the non-moving party, the court determines there is no genuine dispute as to any material fact, then summary judgment is appropriate. *Wisniewski v. Johns-Manville Corp*., 812 F.2d 81, 83 (3d Cir. 1987).

### III.    ANALYSIS

#### A.  Plaintiff's National Origin Discrimination and Harassment Claims

Plaintiff concedes that she did not exhaust her claims under Title VII and the PHRA for national origin discrimination and harassment. Therefore, summary judgment is granted as to those claims.

#### B.  Religious Discrimination Claims

In her complaint, Plaintiff asserts claims for "race and/or national origin and/or religion." (*See generally* ECF No. 10.) Her complaint includes factual allegations regarding potential discrimination related to her identity as a Muslim woman. (*Id.*) However, her response to Defendants' Motion for Summary Judgment, including her own statement of disputed facts, makes no mention of religious discrimination or any events related to her religious identity. (ECF Nos. 29, 30.) Therefore, the Court finds there is no genuine dispute of fact regarding her claims of religious discrimination. To the extent she is still alleging discrimination based on her religion, summary judgment is granted as to those claims.

### C. Hostile Work Environment Claim

Plaintiff asserts a hostile work environment claim under Title VII.[3] Defendants argue that they are entitled to summary judgment on Plaintiff's hostile work environment claim, because Plaintiff has "not presented sufficient evidence to prove harassment on the basis of race, religion, or national origin." (ECF No. 26 at 5.) Defendants argue that the microaggressions Plaintiff alleges, which make up the bulk of her hostile work environment claims, are insufficient to establish such a claim. (*Id.* at 6.)

To establish a hostile work environment on the basis of race, a plaintiff must show "1) the employee suffered intentional discrimination because of her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability [meaning the employer is responsible]." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)). Defendants only challenge that Plaintiff satisfies prongs 2 and 4 of the test.

To determine whether a work environment was hostile, a court must consider the totality of the circumstances; the court must view all of the conduct together "rather than parse out individual incidents." *Mandel*, 706 F.3d at 168. To evaluate the totality of the circumstances, the Court must consider such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Miller v. Thomas Jefferson Univ. Hosp.*, 565 F. App'x 88, 93 (3d Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23

---

[3] Defendants state Plaintiff has asserted hostile work environment claims under Counts I, II, and VI, however, it is not apparent to the Court that Plaintiff's 1981 or PHRA claims include allegations of a hostile work environment.

(1993)). Effect on an employee's psychological well-being may also be taken into consideration. *Id.*

### i.    Whether the Discrimination was Severe or Pervasive

To prove that conduct was severe or pervasive, a claimant must show that the "workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive" such that it "amount[ed] to a change in the terms and conditions of employment." *Perry v. Harvey*, 332 F. App'x 728, 730-31 (3d Cir. 2009) (internal citations omitted).

Defendants assert that "while Mr. Goropoulos, Dr. Foley, Ms. Grossman, and Mr. Diller may have made various remarks regarding Plaintiff's race . . . , such as referencing race during various conversations, remarking that it is difficult for CHISJCH to hire black therapists, commenting on Plaintiff's complexion, hair texture, and personality traits, and comments regarding Dr. Foley's non-diverse neighbors, may be lamentable, such microaggressions lack the severity required to sustain a HWE claim." (ECF No. 26 at 8.)

In support of this claim, Defendants cite to ten cases they claim stand for the proposition that "microaggressions are more similar to 'mere offensive utterances' than 'physically threatening or humiliating statements' and are insufficient to support a HWE claim." (*Id.* at 9-10 (citations omitted).) However, none of the cases Defendants cite to, of which only one is from this district, stand for that proposition at all. Defendants have selectively-picked opinions that include the word "microaggression," in which Courts ruled that the Plaintiff did not establish a hostile work environment.

Each of those cases cited by the Defendants stated specific deficiencies in the record—a lack of severity, lack of frequency, lack of specificity of the conduct—that resulted in the Court ruling against the Plaintiff. *See, e.g.*, *Henderson v. Montgomery Cty. Cmty. Coll.*, No. 19-1064,

2021 U.S. Dist. LEXIS 135628, at *52-53 (E.D. Pa. July 21, 2021) ("There is no genuine dispute that, when viewed together, they in any way reached the level of severity that would interfere with her ability to perform her job duties or were so extreme as to amount to a change in the terms and conditions of her employment."); *Boncoeur v. Haverstraw-Stony Point Cent. Sch. Dist.*, No. 20-10923, 2022 U.S. Dist. LEXIS 51428, at *35 (S.D.N.Y. Mar. 22, 2022) ("Plaintiff's contention that he was subjected to an unspecified 'spate of micro-aggressions,' is insufficient to plausibly allege a hostile work environment claim."); *Paschall v. Tube Processing Corp.*, No. 19-4488, 2021 U.S. Dist. LEXIS 71173, at *55 (S.D. Ind. Apr. 13, 2021) ("Mr. Benash's inappropriate sexual comments—while disgusting and undoubtedly inappropriate—represent an isolated incident that was not so severe as to create an objectively hostile work environment.").

In this case, Plaintiff has identified more than thirty comments and actions referring explicitly and implicitly to her race. These comments were made by colleagues and supervisors, and ranged from white employees receiving larger offices, to comments about Plaintiff's hair texture and complexion, to statements that Black women should be grateful for any pay equity—to name only a few—that she characterizes as microaggressions. (ECF No. 27 ¶ 14 (citing Pl's Dep. 153:11).) She was instructed numerous times to tone down her blackness. (ECF No. 27 ¶14(v).)) Arguably, some of these comments are not "micro" aggressive at all but are explicitly about race. Defendant attempts to discredit Plaintiff's claims about receiving an inferior office by stating that poor working conditions do not establish a hostile work environment. (ECF No. 26 at 11.) This statement ignores—either deliberately or obtusely—that Plaintiff is making a comparison between her office and that of her white colleagues; she is not complaining that the office in and of itself is unsuitable. These comments and actions run the gamut from insensitive to distasteful to offensive and possibly discriminatory. Viewing the facts in the light most favorable to the non-

moving party, there is a dispute of fact as to whether these comments and actions were severe or pervasive.

### ii.    Whether the Discrimination would Detrimentally Affect a Reasonable Person in Like Circumstances

"It is not sufficient for Plaintiff to have subjectively perceived the harassment as severe or pervasive," however, if "the conduct in question [is] so severe or pervasive that it creates an objectively hostile work environment" then the Plaintiff has met their burden. *Brooks v. CBS Radio, Inc*., 342 F. App'x 771, 776 (3d Cir. 2009) (citing *Weston v. Pennsylvania,* 251 F.3d 420, 426 (3d Cir.2001)).

Defendants assert that a reasonable person would not be detrimentally affected in similar circumstances. (ECF No. 26 at 13.) In support, Defendants cite law that where conduct is not severe or pervasive, it would be inconsistent to find that a similarly situated person would be detrimentally affected. (*Id.* (citing *Brooks v. CBS Radio, Inc*., No. 07-519, 2007 U.S. Dist. LEXIS 92213, at *48-49 (E.D. Pa. Dec. 17, 2007)).) However, the Court has determined that the conduct *was* severe or pervasive such that it created a hostile work environment. Given the objective offensiveness of Defendants' comments towards Plaintiff, the Court finds that a like person would be detrimentally affected under similar circumstances.

Because there is, at minimum, a genuine dispute of fact as to whether there was a hostile work environment, Defendants' Motion for Summary Judgment on the hostile work environment claims is denied.

### D. Employment Discrimination Claims

Defendants also move for summary judgment on Plaintiff's discrimination claims. Plaintiff has pled disparate treatment under Title VII, discrimination under 42 U.S.C. § 1981, and discrimination under the PHRA. Because the analysis required for adjudicating Plaintiff's Title VII

and PHRA claims is identical, the Court will consider those two claims together. *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 317, n. 3 (3d Cir.2000). In the absence of direct evidence of discrimination, the Supreme Court has set out a framework to analyze claims of racial discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

### i.    Prima Facie Case of Discrimination

Plaintiff must first prove a prima facie case of discrimination. *Id*. at 802. To establish a prima facie case of employment discrimination, a plaintiff must demonstrate by a preponderance of the evidence that, "(1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position that he sought to retain; (3) the plaintiff suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination." *Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014) (internal citations omitted).

Defendants do not dispute the first three elements of the prima facie case; they argue only that there is no dispute of fact that the circumstances of her termination do not give rise to an inference of intentional discrimination. (ECF No. 26 at 14.) Defendants argue that Plaintiff has failed to identify a similarly-situated non-African American director supervised by Goropolous who was treated more favorably than she was. (*Id.* at 15.) "In fact," Defendants state, "there is zero evidence that any CHISJCH employee had ever tricked their co-workers and subordinates that they were quitting as Plaintiff did." (*Id.*) According to Defendants, Plaintiff was fired for falsely telling various CHISJCH employees that she planned to quit and for failing to take seriously what her employer perceived as a lack of commitment to her work. (*Id.* at 16.) Defendants contend that Plaintiff has offered no evidence in support of her claim that her termination was due to her race. (*Id.* at 17.)

16

In addition, because Goropolous and Grossman both hired and fired Plaintiff, Defendants assert the "same actor" inference—by which courts may apply a strong inference towards non-discrimination when the same person hired *and* fired the plaintiff. (*Id.* at 15-16.) However, there is a split among circuits in applying the "same actor" inference, and the Third Circuit has come down against it. *See Waldron v. SL Indus., Inc.,* 56 F.3d 491, 496 (3d Cir. 1995) ([W]here . . . the hirer and firer are the same and the discharge occurred soon after the plaintiff was hired, the defendant may of course argue to the factfinder that it should not find discrimination. But this is simply evidence like any other and should not be accorded any presumptive value."). Therefore, this Court will not give it any greater weight beyond what it would consider for any evidence.

Plaintiff responds that although Defendants rely on the argument that Plaintiff has not pointed to a similarly-situated non-African American director supervised by Goropolous who was treated more favorably, the inference element of the prima facie case can be established in a number of ways. (ECF No. 30 at 6.) For example, a Plaintiff may point to the hiring of a replacement not in the protected class. *See Bullock v. Children's Hosp. of Philadelphia*, 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999). In this case, following Plaintiff's termination, two Caucasian employees performed the Director of Behavioral Health Operations job duties. (ECF No. 30 at 7, citing Grossman Dep. 83:1-13).) The position was then renamed to Manager of Behavioral Health Operations, and another Caucasian woman was hired for the role. (ECF No. 30 at 7 (citing Grossman Dep. 82:18-24).)

Plaintiff also notes that the fourth element of the prima facie case can be established through the same evidence used to show pretext. (ECF No. 30 at 8, citing *See McFadden v. Whole Foods Mkt. Grp., Inc*., 2021 U.S. Dist. LEXIS 35644, *2.) A plaintiff may point to evidence from which a factfinder could disbelieve an employer's stated legitimate, nondiscriminatory reason and

find that an invidious discriminatory reason was more likely the cause of the termination. *Norman v. Kmart Corp.*, 485 F. App'x 591, 593 (3d Cir. 2012) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). Plaintiff argues that the many comments in the record involving her race are evidence that her termination was motivated by Defendants' feelings about her race. (ECF No. 30 at 9.) In particular, she notes that although CHISJCH had a corrective action policy that would provide Plaintiff with several warnings before separation, Plaintiff was never disciplined, placed on an improvement plan, or given any warnings before her termination. (ECF No. 30 at 9 (citing CHISJCH118-121 (Ex. G); Grossman Dep. 53:21- 23, 56:14-16, 71:13-21).)

Plaintiff is correct that showing a similarly situated employee treated differently is only one way to show an inference of discrimination; she can also show the inference through evidence of being replaced by white employees, and evidence that Defendants' discriminatory intent was more likely the reason for her termination. The Court finds that Plaintiff has shown sufficient evidence to establish a prima facie case.

### ii.    Legitimate, Non-Discriminatory Reason

The Plaintiff having established her prima facie showing of discrimination, the burden then shifts back to Defendants to articulate a legitimate, non-discriminatory reason for Plaintiff's termination. *See McDonnell Douglas*, 411 U.S. at 802. This burden is relatively light. Wh*itmire v. Kvaerner Philadelphia Shipyard*, 340 F. App'x 94, 97 (3d Cir. 2009) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).) To do so, the employer must demonstrate "evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes* 32 F.3d at 763.

CHISJCH has offered sufficient evidence of a legitimate, non-discriminatory reason for Muhammad's termination. Defendants point to evidence—namely, Plaintiff's conversations with

various employees about her plans to quit—that could warrant termination. (*See* ECF No. 26 at 17)

### iii.    Pretext

The burden then shifts back to Plaintiff to establish that this legitimate reason is simply pretext for Defendant's alleged discrimination. *McDonnell Douglas*, 411 U.S. at 804. At the summary judgment stage, a plaintiff can establish pretext by pointing "to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

This Court has determined that Plaintiff has offered sufficient evidence for a reasonable factfinder to find that Defendants' proffered reasons for her termination are pretextual. Defendants repeatedly claim that Muhammad's comments about her desire to quit were the reason for her termination, because the comments "irreparably damaged multiple relationships in the workplace." (ECF No. 26 at 19.) To the extent the Court believes that such comments are enough to warrant termination at all, Defendants' actions are undermined by the fact that they failed to take any corrective steps to discipline Plaintiff or otherwise address her behavior before terminating her. CHISJCH had a process for corrective action, including PIPs and warnings, but Defendants took none of these steps. (ECF No. 29-4 ¶ 26.) Defendants claim that Plaintiff's relationships were "irreparably" harmed, but made no effort at any repair. (ECF No. 26 at 19.)

Defendants rightly point out that failure to follow a non-mandatory employer disciplinary policy is not necessarily indicative of pretext. (ECF No. 31 (citing *Maull v. Div. of State Police*, 39 F. App'x 769, 774 (3d Cir. 2002)).) However, the Court is not basing its determination solely on

Defendants' failure to follow its own policy; rather, it is that failure combined with an unconvincing reason for termination *and* the barrage of comments Plaintiff faced from colleagues on a regular basis that directly state race or infer race lead the Court to its conclusion. *See Holsworth v. Nazareth Hosp.,* No. CV 18-3892, 2021 WL 10352911, at *1 (E.D. Pa. May 13, 2021) ("A reasonable jury could infer retaliation from the *combination* or totality of circumstances related to, *inter alia*, Defendant's failure to follow its policy, the timing of disciplinary actions and the termination, and the inconsistencies in Defendant's proffered reasons for termination.").

A reasonable factfinder could determine that the reason put forward for Plaintiff's termination was pretextual. Summary judgment is denied as to Plaintiff's discrimination claims. However, for the reasons explained *infra*, summary judgment is granted for Defendant Goropolous as to the PHRA claims only. *See infra*, Section F.

### E. Retaliation

Plaintiff alleges retaliation under 42 U.S.C § 1981 for her termination due to her race, and for her opposition to Defendants' unlawful employment practices. (ECF No. 10 at 11 ¶¶ 4-5.) She also alleges Title VII and state law retaliation, again because she was terminated after expressing opposition to Defendants' unlawful employment practices. (*Id.* at 12-15.) Like employment discrimination claims, retaliation claims are analyzed under the *McDonnell Douglas* burden shifting framework. *See Moore v. City of Phila.*, 461 F. 3d 331, 342 (3d Cir. 2006). However, in this case, Defendants do not challenge that Plaintiff has established a prima facie case of retaliation, only that she may not establish that Defendants' stated reason for terminating her was pretextual. (ECF No. 26 at 18.)

The Court has already determined that there is a genuine dispute of fact as to whether Muhammad's termination was pretextual as to her employment discrimination claims. *See supra*

D.iii. Defendants rely on the same pretext arguments for both the discrimination and retaliation claims, so the Court now considers the same arguments in the context of retaliation.

Defendants argue that "the only relevant question is whether there is evidence that Mr. Goropolous and Ms. Grossman did not genuinely believes that Plaintiff had . . . inappropriately 'joked' with her subordinates and Mr. Diller that she was quitting and . . . irreparably damaged multiple relationships in the workplace." (ECF No. 26 at 20.) However, the record supports that Plaintiff repeatedly complained to both Goropolous and Grossman about the comments made regarding her race, and she was dismissed and disregarded. Therefore, the only relevant question is not simply whether Plaintiff actually joked about quitting, and whether this could be a legitimate reason for her termination, but whether the Plaintiff offers some evidence by which a factfinder could "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999) (citing *Fuentes,* 32 F.3d at 764). The Court finds that Plaintiff has established a genuine dispute of fact regarding whether her termination was pretextual. Summary judgment is denied as to her retaliation claims.

**F.  Individual and Employer Liability for Plaintiff's PHRA Claims**

**i.      Individual Liability for Counts VI and VII**

Plaintiff has asserted claims under the PHRA § 955(d) against all Defendants for discrimination (Count VI); under PHRA § 955(d) for retaliation against all Defendants (Count VII); and under PHRA § 955(e) against individual defendants (now, only Defendant Goropolous), for aiding and abetting (Count VIII). (*See generally* ECF No. 10.) Defendants argue that Goropolous is entitled to summary judgment on Counts VI and VII, because individual defendants

cannot be liable under the PHRA for discrimination, harassment, and retaliation. (ECF No. 26 at 22, citing *Dici v. Commw. of Pa.*, 91 F.3d 542, 552 (3d. Cir. 1996).)

In her response, Plaintiff acknowledges that PHRA § 955(a) allows a plaintiff to recover only from employers, not from individual employees. (ECF No. 30 at 15.) Plaintiff does not seem to dispute the contention that Goropolous cannot be liable under any section of the PHRA except for § 955(e), the section that extends liability for discrimination beyond Title VII, and allows an individual employee to be held liable for aiding and abetting a discriminatory action. *See Dici*, 91 F.3d at 552. Therefore, with respect to Counts VI and VII of Plaintiff's complaint, summary judgment is granted as to Goropolous only.

###    ii.    Aiding and Abetting Claims

With respect to Plaintiff's aiding and abetting claim under PHRA § 955(e), Defendants argue only that "[i]f the employer is not liable for any discriminatory practice than an individual employee cannot be held liable for aiding and abetting a discriminatory practice." (ECF No. 26 at 23, citing *Arnold v. AutoZone, Inc.*, No. 13-1329, 2016 U.S. Dist. LEXIS 25759, at *41 (E.D. Pa. Mar. 2, 2016).) Because the Court denied summary judgment as to the discrimination claims against CHISJCH, it is not the case that Plaintiff cannot establish that Goropolous aided and abetted his employer's discriminatory conduct. Summary judgment is therefore denied.

### G.  Defendants' Motion to Strike Liquidated and Punitive Damages

Defendants ask the Court to strike Plaintiff's request for liquidated and punitive damages, arguing that liquidated damages are not available under § 1981 or Title VII, and punitive damages are not available under the PHRA. (ECF No. 26 at 23-24.) Plaintiff responds that her complaint does not delineate what damages she is seeking for which of her claims; rather, the complaint

summarizes are relief she is seeking. (ECF No. 30 at 17.) Plaintiff does not contest that liquidated damages are not available under § 1981 or Title VII. (*Id.*)

The Court agrees that Plaintiff's complaint does not specify what relief she seeks for which cause of action, and at this time does not believe it necessary to address the issue of damages. When or if the time presents itself for a discussion regarding damages, the Court will ensure that the law is applied appropriately and allow the parties to submit additional briefing if disputes arise. At this time, Defendants' motion for the Court to strike Plaintiff's request for liquidated and punitive damages is denied.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. An appropriate order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

_____

**HODGE, KELLEY B., J.**